UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMES R. CALLENDER, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:15-cv-o0409 |
| | ) CHIEF JUDGE CRENSHAW |
| TYSON FRESH MEATS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

Pending before the Court is Tyson Fresh Meats, Inc.'s ("Tysdon") Motion for Summary Judgment (Doc. No. 51), to which James R. Callender Jr. has responded in opposition (Doc. No. 58) and Tyson has replied (Doc. Nos. 65, 71). For the reason that follow, the Motion will be granted in part and denied in part.

## I. Factual Background[1]

After working for three years as a Processing Supervisor at Tyson's Carthage, Texas plant, Callender applied for an open position at Tyson's Goodlettsville, Tennessee plant. (SOF ¶¶ 1-3). He was interviewed, and his transfer was approved by Gary Denton, the Goodlettsville's Complex Human Resources Manager, and by Doug Griffin, the Operations Manager of that facility. (Id. ¶ 4).

Callender started working at the Goodlettsville plant on December 13, 2009 as a Production Supervisor on the B-Shift in the Beef Department. In November 2012, he transferred to an open

---

[1] The following facts are drawn from Tyson's Statement of Undisputed Material Facts (Doc. No. 53) and Callender's responses thereto (Doc. No. 70) (collectively "SOF"). The Court omits many of the facts that are contained in those filings because Callender has abandoned both his age and race discrimination claims. Furthermore, some of the facts are unnecessary for background purposes, but are useful in the legal discussion that follows and are discussed in that section.

1

Production Supervisor position in the Beef Department on A-Shift and started reporting to A-Shift General Supervisor Ken Jenkins. Jenkins, in turn, reported to Griffin. (Id. ¶ 21, 23).

In June 2013, Griffin supervised the A-Shift Beef Department while Jenkins was on vacation. On June 20, 2013, Griffin issued Callender a written warning after he allegedly failed to follow his directions for three consecutive days. (Id. ¶ 25).[2] Griffin met with Callender on June 20, 2013 to discuss the written warning, which stated: "[Callender] is receiving a written warning for failure to follow directions. Reed will also be placed on an action plan." When Jenkins returned from vacation, Griffin told him about the written warning and instructed Jenkins to prepare a Performance Improvement Plan or PIP. (Id. ¶¶ 27, 28).

The PIP from Jenkins covered three performance deficiencies: (1) Management and Communication Skills, (2) Efficiencies, and (3) Yields. With respect to "Management and Communication Skills," Tyson expected Callender to follow management's instructions, improve his communication with subordinates, and ensure that his team was implementing the processes required to achieve production goals. As for "Efficiencies," Tyson expected Callender to run a minimum of 104% efficient on all primals[3] on his production line. Finally, with regard to "Yields," Callender was expected to monitor his yields and identify which yield category he was not achieving. (Id. ¶¶ 31-34).

Callender does not dispute the existence of the PIP, or that he signed it on July 8, 2013. (Id.

---

[2] In his deposition, Callender did not dispute that these events occurred. However, in an Affidavit filed with his response to Defendant's Statement of facts, Plaintiff asserts that he "did follow directions, however, given the language barrier, the fact it was during a very busy time of year, the new process which was being implemented by Griffin was not easy to implement overnight and Griffin was just impatient with how long it was taking Callender to accomplish the new method." (Doc. No. 60, Callender Aff. ¶ 12).

[3] "Primal" refers to a particular muscle, like the chuck tender that are cut into products (such as a steak) on the production line. Each line runs a particular set of primals. (Doc No. 52 at 5 n.1).

2

¶ 35). Nor does he dispute knowing that his failure to improve and achieve the goals outlined in the PIP would result in discipline, up to and including termination. (Id. ¶¶35, 36). He claims, however, that the "[i]ntent of the Action Plan was to harass plaintiff and retaliate against him for complaining about Ken Jenkins." (Id. ¶ 34). In this regard, Callender asserts that, after meeting with Jenkins on July 1, 2013 to discuss the PIP, he refused to sign it and then took it to Denton and complained that Jenkins was holding him to a higher standard than other Production Supervisors because of his race and age. Callender also claims that, after meeting with Denton, he was called to a meeting with Griffin, Jenkins and Denton and was essentially told he "needed to get on board with the Action Plan or be fired." (Doc. No. 60, Callender Aff. ¶ 16). It was then that Callender signed the PIP, and Jenkins changed the date from July 1 to July 8. Callender also claims that once Jenkins learned he had complained,[4] Jenkins scoring of his performance was "way out of line." (Id. ¶¶ 38, 39).

Callender and Jenkins met twice to discuss Callender's progress, and on August 8, 2013, they met a third time to review the final results. Jenkins determined that Callender had achieved only 32.5 percent of the goals listed in his PIP, and Jenkins had documented 10 occurrences of Callender's alleged failure to follow or give instructions.

Callender was terminated from employment on August 9, 2013. He filed suit in this Court on April 10, 2015, alleging race discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.* and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*; age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §

---

[4] Plaintiff admitted in his deposition that he does not know if Denton ever discussed his complaint with Jenkins; Jenkins testified that he was unaware of any complaint until after Callender was terminated; and Denton testified that he never told Jenkins that Callender made any type of discrimination complaint about him. (Id. ¶¶ 40-42).

3

621 *et seq.* and the THRA; and retaliation in violation of Title VII and the THRA. Tyson moves for summary judgment on all claims.

## II. Standard of Review

The standards governing summary judgment have been restated on countless occasions and are well known. It suffices to note: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party <u>Van Gorder v. Grand Trunk W. R.R., Inc.</u>, 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, <u>Rodgers v. Banks</u>, 344 F.3d 587, 595 (6th Cir. 2003).

## III. Legal Analysis

### A. Race and Age Discrimination

In response to Tyson's Motion for Summary Judgment, Callender asserts that, while his "Complaint also contained a cause of action for discrimination . . . at this stage of the proceedings, [he] has elected not to respond to Defendant's Motion for Summary Judgment in this regard." (Doc. No. 59 at 2 n.2). Callender, therefore, has abandoned his claims for age and race discrimination and summary judgment will be granted on those claims. See <u>Clark v. City of Dublin</u>, 178 Fed. App'x 522, 524–25 (6th Cir. 2006) (finding district court did not err when granting summary judgment on claims that were not properly responded to); <u>Conner v. Hardee's Food Sys., Inc.</u>, 65 Fed. App'x 19 (6th Cir. 2003) (finding plaintiffs had abandoned their claim "[b]ecause [they] failed to brief the issue

4

before the district court").

**B. Retaliation**

Section 704(a) of Title VII makes it "an unlawful employment practice of an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Similarly, the THRA makes it "a discriminatory practice" for an employer to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by [the THRA] or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under [the THRA]." Tenn. Code Ann. § 4-21-301(a)(1). "Retaliation claims under the THRA follow federal law," Wade v. Automation Pers. Servs., Inc., 612 F. App'x 291, 300 (6th Cir. 2015), and, therefore, "a retaliation claim under both statutes follows the same analysis," Arendale v. City of Memphis, 519 F.3d 587, 606 (6th Cir. 2008); see Phillips v. Interstate Hotels Corp., 974 S.W.2d 680, 683 (Tenn. 1998) (Tennessee Supreme Court observing that, "[a]lthough the language differs slightly, it is clear that the legislature intended the THRA to be coextensive with federal law.").

Where, as here, a plaintiff presents no direct evidence of discrimination or retaliation, his claims are analyzed under the familiar McDonnell Douglas/Burdine[5] burden-shifting framework. "To establish a prima facie case of retaliation, [a plaintiff] must show '(1) that [he] engaged in a

---

[5] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).

5

protected activity; (2) that the defendant had knowledge of [his] protected conduct; (3) that the defendant took an adverse employment action towards [him]; and (4) that there was a causal connection between the protected activity and the adverse employment action.'" Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523 (6th Cir. 2008) (brackets in original) (quoting Weigel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 381 (6th Cir. 2002)). "If the plaintiff satisfies [his] prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-retaliatory reason for the adverse employment action." Id. "If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendants proffered reason is a pretext for unlawful retaliation." Id.; accord E.E.O.C. v. New Breed Logistics, 783 F.3d 1057, 1066 (6th Cir. 2015).

Tyson argues that summary judgment is warranted for two reasons. First, Callender cannot establish a causal connection for purposes of his *prima facie* case and, second, he cannot show that the reason for his termination was a pretext for retaliation. The Court considers the issues in turn.

### *1. Causal Connection*

"Title VII retaliation claims must be proved according to traditional principles of but-for causation[.]" Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013). Recently, the Tennessee Court of Appeals opined "that the Tennessee Supreme Court would adopt the reasoning of Nassar" and "h[e]ld that a plaintiff making a retaliation claim under the THRA 'must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" Goree v. United Parcel Serv., Inc., 490 S.W.3d 413, 440 (Tenn. Ct. App. 2015) (quoting Nassar, 133 S.Ct. at 2534).

Tyson argues that Callender's "but for" retaliation claim fails at the outset because, in his deposition, Callender testified that his termination may have been the result of several things. More

specifically, Tyson points to the following exchanges between counsel and Callender:

> Q. Mr. Callender, why do you believe you were terminated from Tyson?
>
> A. Because I complained about treatment I was receiving from Ken Jenkins, because I made the call to the 800 number.
>
> Q. Any other reasons you can think of?
>
> A. Ken didn't like me.
>
>       *                *                *
>
> Q. Is there anything else that you can recall?
>
> A. Regarding?
>
> Q. As the basis for your retaliation claim?
>
> A. Possibly the call to the 800 number. That didn't sit well with them. So, like I said, from the get-go, Ken had it out for me. And I believe because of -- it started out, I called the 800 number. That's how I got on A shift. He didn't want me on A shift; he wanted his buddy Thomas Barton to come back to A shift who had been out on an injury.

(Pl. Dep. at 165, 264-65).[6] Tyson insists that these "admissions preclude a finding of 'but-for' causation" and his "testimony that he was terminated for reasons other than his alleged discrimination complaint is dispositive of his retaliation claim." (Doc. No. 65 at 2-3).

Plaintiff's so-called "admissions" may ultimately serve as the death-knell for his retaliation claim, but they alone are not fatal. The question is why Callender was terminated, not why he believes he was terminated. See Tillis v. Sheriff of Indian River Cty., 603 F. App'x 851, 853 (11th Cir. 2015) (citation omitted) (noting that the inquiry "centers on the defendant's beliefs, not the

---

[6] The call to the 800 number was not protected activity, but rather was a complaint about how Tyson intended to change its practice with regard to seniority and shift changes. Callender conceded in his deposition that this call related only to his disagreement with the proposed changes and had nothing to do with his race or age. (Doc. No. 53-1, Callendar Depo. at 60).

7

employee's beliefs or 'reality as it exists outside of the decision maker's head.'"); Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) (citation omitted) ("The ultimate question in any retaliation case is an intent to retaliate *vel non.*").

Callender's deposition testimony aside, Tyson argues that the only possible basis for Callender to show a causal connection is the nearness in time between his complaint to Denton and his termination. Citing a couple of district court decisions, Tyson sings the familiar song that temporal proximity alone is insufficient to establish but-for causation.

Recently, the Sixth Circuit observed that "[i]n some cases temporal proximity alone may be sufficient." Savage v. Fed. Express Corp., 856 F.3d 440, 448 (6th Cir. 2017).[7] "Where the adverse employment action 'occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.'" Id. (quoting Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008)). The Sixth went on to observe that while it had "not considered any specific ceiling on the period of time that a court will consider sufficient to show temporal proximity," it had "found that a time period of a month or more may establish temporal proximity." Id. (citing Dye v. Office of the Racing Comm'n, 702 F.3d 286, 306 (6th Cir. 2012) (finding that two months sufficient to show a causal connection); Singfield v. Akron Metro. Housing Auth., 389 F.3d 555, 563 (6th Cir. 2004) (stating that three months was "significant enough to constitute sufficient evidence of a causal connection"). The Sixth Circuit in Savage found that a delay of 33 days between protected activity and a suspension, and a 41 day period between the

---

[7] While Savage involved a claim under Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. 431 *et seq.*, the Sixth Circuit noted that "the same legal standard as in other retaliation cases" applied. Id.

8

activity and termination "raise[d] an inference that the adverse action was motivated by [plaintiff's] protected activity." Id. at 499.

Here, there was a 38-day gap between the time Callender spoke to Denton and his termination. The Court finds this sufficient to establish causation for purposes of Callender's *prima facie* case, particularly since "'[t]he burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met.'" Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013) (quoting Mickey, 516 F.3d at 523).

### *3. Proffered Reason and Pretext*

Tyson claims Callender was fired because he did not comply with the terms of the PIP. This is a legitimate non-retaliatory reason for termination. Hussain v. Highgate Hotels, Inc., 126 F. App'x 256, 265 (6th Cir. 2005); Jenkins v. Electrolux Home Prod., Inc., 2016 WL 6875970, at *7 (M.D. Tenn. Nov. 22, 2016).

Because Tyson has proffered a legitimate non-retaliatory reason for its employment decision, the burden falls on Callender to produce evidence from which a reasonable jury could conclude that Tyson's stated reason is a pretext for retaliation. Callender can do so by "showing that the reason (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." Upshaw v. Ford, 576 F.3d 576, 585 (6th Cir. 2009). "The plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant intentionally [retaliated] against him." Id.

The closeness in time between the complaint and Callender's termination could be meaningful but, "[u]nlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'" Seeger v. Cincinnati Bell Tel.

Co., LLC, 681 F.3d 274, 285 (6th Cir. 2012) (citing Donald v. Sybra, Inc., 667 F.3d 757, 762 (6th Cir.2012)). Still, "'suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.'" Id. (quoting Bell v. Prefix, Inc., 321 Fed. App'x 423, 431 (6th Cir.2009)). Callender takes a shotgun approach in his efforts to show pretext, but many of his arguments fail because he neglects to consider the timeline leading up to his termination. For example, he argues that in June 2013, just a couple of months before his termination, he received a satisfactory review and a raise, and Jenkins did not see a need for a PIP when he went on vacation later that month. This may well be true, but it hardly shows retaliation because it is undisputed that Callender did not complain about discrimination until *after* the decision to place him on a PIP was made. Similarly, Callender argues that the PIP violated Tyson's Management Disciplinary Protocols because it was prepared by Jenkins and not by Callender. However, no matter who prepared it, that was done before Callender complained about race and age discrimination. Likewise, Callender asserts that the PIP set "expectations" that were "not consistent with Defendant's standards of judging a production supervisor[']s performance" and that the "arbitrary standard" requiring him to "run a minimum of 104% efficient on all primal areas . . . has no basis in reality[.]" (Doc. No. 15 at 15). Maybe so, but giving Callender a herculean task could not be retaliatory when it was set before he made his complaint.

The viability of Callender's beef against Tyson necessarily hinges on what happened once the PIP was put into place because it was only then that he complained. And, it is here, that the Court finds that he has presented sufficient evidence to call into question the proffered reason for his termination.

In this regard, the Court need not delve into the nuances of how the lines are run for specific

10

primals, or what was expected with respect to those lines as Callender suggests. The heart of the dispute turns on credibility and more specifically that of Callender and Jenkins.

Callender complained to Denton that Jenkins was holding him to a higher standard because of his race and age, yet Jenkins is the one who was tasked with grading Callender's performance. This is a logical choice (but not a HR best practice) given that Jenkins was Callender's supervisor. It is also potentially problematic because he is the one who was accused of discrimination. While Jenkins claims not to have known about the complaint until after the fact (something both Griffin and Denton appear to confirm), even without judging credibility, a jury could find this assertion suspect. Between the time the PIP was first presented on July 1, 2013 and the time it was signed on July 8, 2013, all four met to discuss the PIP. Such a meeting would likely have not been necessary but for the fact that Callender refused to sign the PIP. This raises two questions; why did Callender refuse to sign the PIP?, and, more importantly, why did Jenkins not ask either Griffin or Denton for the reason that Callender chose not to sign the PIP? When the facts are construed in Callender's favor as they must be for present purposes, a reasonable jury could conclude that Jenkins both asked and was told why.

Assuming Jenkins was actually aware of the discrimination complaint, a reasonable jury could also conclude that he skewed the scoring of Callender's performance in retaliation for the complaint. This is because the evaluation was not entirely objective.

For example, Callender's performance in relation to whizard operators[8] was found to be unacceptable on July 13 and 27, 2013, and his efforts "to address product styling issue such as tag

---

[8] Whizard operators trim meat for slicing. (Doc. No. 60, Callender Aff. ¶9).

ends and hangovers" were found to be unacceptable on July 13 and August 3, 2013. (Doc. No. 54-1, Callender Dep. Ex. 20). However, under the PIP, Callender was required to spend "20 min[utes] per period working with whizard operators" and "30 min[utes] per period working with stylers." (Id.) It is unclear how Jenkins reached his conclusion that Callender did not fulfill those requirements because in his deposition he testified that he observed Callender "at least" three to four times a day for ten minutes at a time, (Doc. No. 54-2 Jenkins Dep. at 134), leaving many hours in the day for Callender to spend 20 minutes working the whizard operators and 30 minutes working with the stylers. Thus, while Jenkins wrote on the PIP that he "personally never saw [Callender] working with his trimmers," (Doc. No. 54-1 at 98), this does not mean that Callender did not comply with this requirement of the PIP.

Likewise, it is impossible to tell, unless the Court accepts Jenkins' say-so, whether "no direction [was] given for trim and carne" on July 13, 2013, or whether Callender "[d]id not give clear direction on Aldi Eye Rounds trays on August 3, 2013" as Jenkins claims. (Doc.54-1, Callender Dep. Ex. 20). This is further complicated by Callender's claim that many of the team members on the line did not speak English.

Ultimately, and even though the events at issue occurred at Tyson's beef and pork processing facility and not at one of its better known chicken processing plants, having Jenkins grade Callender's performance on the PIP may have been akin to the proverbial fox guarding the henhouse. That is something for the jury to determine.

In reaching this conclusion, the Court agrees that Callender "cannot proceed to trial based on a subjective disagreement with Tyson's business judgment," Carter v. Toyota Tsusho Am., Inc., 529 F. App'x 601, 613 (6th Cir. 2013), and that "it is inappropriate for the judiciary to substitute its

judgment for that of management," Smith v. Leggett Wire Co., 220 F.3d 752, 763 (6th Cir. 2000). At the same time, however, the Court also recognizes that "subjective reasons provide 'ready mechanisms for discrimination,'" Hedrick v. Western Reserve Care Sys, 355 F.3d 444, 461 (6th Cir. 2004) (citation omitted) and "'[w]here termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly susceptible of abuse and more likely to mask pretext,'" Yazdian v. ConMed Endoscopic Techs., Inc., 793 F.3d 634, 648 (6th Cir. 2015) (citation omitted). Here, the jury will have to sort things out because "the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000).

### III. Conclusion

On the basis of the foregoing, Tysons' Motion for Summary Judgment will be granted with respect to Callender's race and age discrimination claims, but denied with respect to his retaliation claim.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE